UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

---------------------------------------------------------------X

GREGORY NASTU,                                  :        **VERIFIED**
                              Plaintiff,        :        **COMPLAINT**

V.                                              :

STAMFORD HEALTH INTEGRATED                      :
PRACTICES, INC., a/k/a "SHIP,"                  :
CORINNE VAN BEEK, M.D.,                          :
DEANA EBRIGHT, M.D.,                             :
KATHERINE TAKAYASU, M.D.,                        :
WILIAM HINES, M.D., and                          :
JOSEPH HINES, M.D.,                              :        **JURY TRIAL**
                              Defendants.        :        **DEMANDED**

---------------------------------------------------------------X

The plaintiff, by and through his attorney, Gary A. Mastronardi, Esq., complains and alleges as follows:

## I.    JURISDICTION AND VENUE

1.      This action is predicated upon provisions of Title III of the Americans with Disabilities Act, 42 U.S.C. § 12182(a) et seq., and principles of the common law of the State of Connecticut.

2.      The jurisdiction of this Court arises under 28 U.S.C. § 1331, and the doctrine of pendent jurisdiction.

3.      Venue lies in this District under the provisions of 28 U.S.C. § 1391.

## II.    THE PARTIES

4.      The plaintiff, GREGORY NASTU, resides at 151 Waterbury Avenue, Stamford, Connecticut.  At all times hereinafter mentioned, plaintiff Nastu was an individual suffering from a psychiatric condition described as "Adjustment Disorder with

1

anxiety features." Said disorder constituted a "mental impairment that substantially limit[ed] one or more [of plaintiff's] major life activities" and, accordingly, rendered the plaintiff "disabled" within the meaning of 42 U.S.C. §§ 12102(1)(A) and (2)(A).

5.     Defendant, STAMFORD HEALTH INTEGRATED PRACTICES, INC., (hereinafter, "SHIP"), is a corporation organized and existing under the laws of the State of Connecticut. Defendant SHIP maintains business offices at 1111 Summer Street, Stamford, Connecticut. At all times hereinafter mentioned, defendant SHIP operated an "integrated physicians network" in partnership with Stamford Hospital which offered healthcare services of all types to the public. As such, defendant SHIP and its "integrated physicians network" constituted a "public accommodation" within the meaning of 42 U.S.C. §§ 12181(7)(F), and 12182(a).

6.     Defendant, CORINNE VAN BEEK, M.D., (hereinafter, "Van Beek") is a licensed physician who is affiliated with SHIP. Defendant Van Beek maintains business offices at 1 Blachley Road, Stamford, Connecticut. At all times hereinafter mentioned, as a licensed healthcare provider affiliated with SHIP, defendant Van Beek's medical practice constituted a "public accommodation" within the meaning of 42 U.S.C. §§ 12181(7)(F) and 12182(a).

7.     Defendant, DEANA EBRIGHT, M.D., (hereinafter, "Ebright"), is a licensed physician who is affiliated with SHIP. Defendant Ebright maintains business offices at 36 Grove Street, New Canaan, Connecticut. At all times hereinafter mentioned, as a licensed healthcare provider affiliated with SHIP, defendant Ebright's medical practice constituted a "public accommodation" within the meaning of 42 U.S.C. §§ 12181(7)(F) and 12182(a).

2

8.    Defendant, KATHERINE TAKAYASU, M.D., (hereinafter, "Takayasu"), is a licensed physician who is affiliated with SHIP.  Defendant Takayasu maintains business offices at 1 Blachley Road, Stamford, Connecticut.  At all times hereinafter mentioned, as a licensed healthcare provider affiliated with SHIP, defendant Takayasu's medical practice constituted a "public accommodation" within the meaning of 42 U.S.C. §§ 12181(7)(F) and 12182(a).

9.    Defendant, WILLIAM HINES, M.D., (hereinafter "William Hines") is a licensed physician and SHIP's "Chief Medical Officer."  On information and belief, defendant William Hines maintains a business office at 1111 Summer Street, Stamford, Connecticut.  At all times hereinafter mentioned, as SHIP's chief medical officer, defendant William Hines was an individual whose decisions implemented policies and procedures of an entity constituting a "public accommodation under 42 U.S.C. §§ 12181(7)(F) and 12182(a).

10.    Defendant, JOSEPH HINES, (hereinafter, "Joseph Hines") is SHIP's "Director of Safety, Security and Emergency Management."  On information and belief, defendant Joseph Hines maintains his business office at 1111 Summer Street, Stamford, Connecticut.  At all times hereinafter mentioned, as SHIP's Director of Safety, Security and Emergency Management, defendant Joseph Hines was an individual whose decisions implemented policies and procedures of an entity constituting a "public accommodation" under 42 U.S.C. §§ 12181(7)(F) and 12182(a).

### III.    BACKGROUND

11.    Defendant SHIP operates an integrated physicians' network that exists in partnership with Stamford Hospital.  Its stated goal is to make a difference in the health

3

of the community by working together to meet the medical needs of the public and provide the best care and services possible.

12.     SHIP-affiliated physicians include many of the most respected physicians in the Greater Fairfield County area, many recognized on national, regional and local "Top Doctor" lists.

13.     Offices of SHIP-affiliated physicians are situated in convenient locations throughout lower Fairfield County.

14.     Approximately twenty-five years ago, plaintiff Nastu was severely injured in a very serious motor vehicle accident.  As a result of the accident, he suffered a broken neck and, for months afterward, he often found himself in excruciating pain, which caused high levels of stress, strong feelings of depression, anxiety and hopelessness, an inability to think clearly and relate to people meaningfully, sleeplessness and loss of appetite.  However, the plaintiff did not seek psychiatric treatment for this condition at that time.

15.     Plaintiff first came to defendant Van Beek, an orthopedic surgeon, in early 2014.  At the time, he had issues involving the rotator cuff of his right shoulder and a thickness tear to his left elbow, and he told the doctor about his prior "broken neck" injury, about the terrible pain it had caused him, and about all of the stress, anxiety, depression, etc., with which he suffered back then as a result of what he explained to her was an extreme difficulty on his part coping with pain.

16.     Thereafter, on two occasions during the year 2014, at defendant Van Beek's recommendation, plaintiff underwent corrective surgery; first, on February 10, 2014, to the rotator cuff of his right shoulder and, then, on August 29, 2014, a left elbow debridement with partial osteotomy to remedy a thickness tear to his left elbow.

4

As in the past, after each surgery, plaintiff's recovery was extremely difficult due to recurring problems he had coping with the resulting pain.

## IV.   FACTS

17.    On December 11, 2014, about four months after his elbow surgery, plaintiff went to defendant Van Beek's office for his final, post-operative examination of his left elbow.  Back in August of 2014, when he was preparing for elbow surgery, defendant Van Beek had told him that she had noticed, in a pre-operative MRI taken of plaintiff's left side, the existence of an "intramuscular mass" on his left deltoid that was of some concern to her.  Since, however, at the time, plaintiff's left elbow was the primary focus of the doctor's attention, both the doctor and plaintiff agreed that, after his elbow issue was resolved, he would then, as soon as possible, arrange to see a SHIP surgeon, recommended by defendant Van Beek, for an opinion on how the "mass" identified in the MRI should be treated.  Accordingly, on that same day, December 11, immediately upon conclusion of plaintiff's post-op appointment with defendant Van Beek, plaintiff went to another medical appointment, this one with Dr. Xiang Dong, another SHIP surgeon, for an opinion on the "deltoid mass" issue.

18.    Upon reviewing the August MRI with plaintiff during that December 11 consultation, Dr. Dong recommended that plaintiff undergo surgery to remove the mass, and the news about the prospect of now having to undergo yet another surgery upset plaintiff very much.  When he left the doctor's office, over the next several days, he did not feel well, and he began to experience the same familiar feelings of fear, anxiety and depression that he had felt in the past.  After several days, plaintiff decided to return to defendant Van Beek's office, without an appointment, to confer

with her about Dr. Dong's recommendation.  This was some time in the latter part of December.

19.     During his unscheduled, late December visit with defendant Van Beek, plaintiff reported to her that, since receiving the bad news from Dr. Dong, he was feeling extremely weak, light headed, dizzy and just generally ill, and that he had also begun to experience elevated levels of stress and anxiety, sleeplessness, an inability to think clearly and feelings of hopelessness.  He also reported to her that he had started to find it extremely difficult to control his emotions, sometimes crying uncontrollably.

20.     Upon hearing his complaints, defendant Van Beek referred plaintiff to defendant Ebright, a primary care physician who was also a member of the SHIP network.  Van Beek told plaintiff at that time that he should stay calm, follow Dr. Ebright's instructions, and that the surgery on the mass on his left deltoid that had been recommended by Dr. Dong might not be necessary for quite some time.

21.     On January 7 or 8, plaintiff's left shoulder suddenly began to hurt a great deal.  Therefore, on that date, he returned to defendant Van Beek's office, spoke with defendant Van Beek's medical assistant, and scheduled an appointment with the doctor for January 20, 2015.

22.     On January 20, plaintiff returned to defendant Van Beek's office for the scheduled appointment.  By this time, almost two weeks after he had made the appointment, the pain in plaintiff's left shoulder had substantially worsened.

23.     Immediately upon arrival at the doctor's office, plaintiff was ushered into the x-ray room and had three x-rays taken of his left shoulder.  Then, after the x-rays, he was brought into an exam room in the office where he met with defendant Van

6

Beek and received the bad news; she told him that his x-rays looked good, but that he had a three-quarter thickness tear in his <u>left</u> rotator cuff.

24.     The new information disclosed to plaintiff by defendant Van Beek frightened him; he asked the defendant for an explanation of what it meant, and was told by the defendant that it meant that, at some point in the future, he would definitely need to undergo more corrective surgery, this time, to his left shoulder rotator-cuff.

25.     Upon hearing this news, plaintiff began to weep loudly and uncontrollably. He asked defendant Van Beek how she could be so sure there was a tear without first having an MRI done, and she replied that she had actually known of the tear for quite some time because the tear was visible in the August 2014 MRI that was done on his left side before his August 2014 surgery on his left elbow.  This was the first time plaintiff had <u>ever</u> been told about this problem.  Thereupon, because he was in excruciating pain, defendant Van Beek gave him a cortisone shot in his left shoulder area and, then, he left the office.  However, the news of this new rotator cuff injury, coupled with Dr. Dong's recent surgical recommendation, and the persistent pain plaintiff now experienced from the cortisone shot, which would not subside in the days after the January 20 visit, sent plaintiff into an elevated state of depression and anxiety.

26.     On February 4, 2015, plaintiff returned for another visit with defendant Van Beek; this one, <u>unscheduled</u>.  After a long wait, he finally got in to see the doctor; and, when he walked into her office, once again, he was crying uncontrollably.  During this visit, he initially complained to Van Beek about the persistent, excruciating pain he was still experiencing from the January 20 cortisone injection, and he reported to her that he was now experiencing elevated levels of stress, anxiety, fear, depression and

feelings of hopelessness.  He told her that he had lost his appetite, so he could not

eat, and that he had begun to lose weight.  He also told her that he was having a great

deal of trouble concentrating in his classes at school, that he could no longer control

his emotions and cried constantly, and that he was obsessed with overwhelming fear

of pain that he anticipated he would have to endure in undergoing two future

surgeries.

27.     During this February 4 visit, plaintiff also could not make himself stop

talking.  He bombarded the defendant with question after question about his shoulder,

many of which defendant Van Beek had already answered during the previous

appointment and, to defendant's credit, she was patient with him and answered every

one of plaintiff's questions again.  At that time, because of his complaints about

anxiety and depression, defendant Van Beek finally decided that the time had come to

refer plaintiff to defendant Takayasu, a SHIP physician, who specialized in "relaxation

techniques," to help plaintiff deal with his emotional issues.

28.     Thereupon, defendant Van Beek, herself, contacted defendant Takayasu,

spoke directly to her, and an appointment was scheduled for plaintiff with defendant

Takayasu for March 3.  However, at that time, defendant Van Beek also said

something to plaintiff that he had not anticipated, that he found extremely disturbing,

and that caused his levels of stress and anxiety to spiral out of control; Van Beek said:

"I'm referring you to Dr. Takayasu; try not to fall in love with her."  This statement left

plaintiff speechless.  He interpreted the defendant's statement about "falling in love" as

a suggestion that Van Beek believed that he was acting like he had fallen in love with

his doctor.

8

29.     On February 13, 2015, still in pain from defendant Van Beek's cortisone shot, and with his levels of stress and anxiety now spiraling out of control, plaintiff returned to defendant Van Beek's office for another scheduled appointment.  When he arrived for this appointment, again, he walked into the office with tears in his eyes, weeping profusely, and, still obsessed with the fear of future surgery.  Therefore, once again, he could not control the need to seek reassurance from defendant Van Beek that he would be able to cope with the pain levels he would likely be experiencing from the future surgery; so, once again, plaintiff flooded the defendant with questions; again, virtually all of which were the same as he had already asked, and which had already been answered by defendant Van Beek during previous visits.  Plaintiff also reiterated to the defendant the emotional problems he was still experiencing, which seemed to worsen each day, and he told the defendant, again, that he was now "losing weight like crazy."  Plaintiff, at the time, also reminded defendant Van Beek about his scheduled appointment with defendant Takayasu, but noted that it was not until March 3, and he asked defendant Van Beek if she thought the appointment could be moved up to an earlier date.

30.     Plaintiff, during this visit, also felt compelled to confront defendant Van Beek, for the first time, with two complaints.  First, he asked her why, if she knew of his left shoulder problem since as far back as the MRI of August of 2014, she had neglected to tell him about the problem.  Second, after reminding defendant Van Beek about the appointment he had scheduled with Dr. Takayasu, he asked defendant Van Beek to please explain to him exactly what she meant when, during the previous visit, she had told him to "try not to fall in love with [Dr. Takayasu]."  When defendant Van Beek did not answer his question about Dr. Takayasu, plaintiff confronted her, directly:

"do you think I'm in love with you?"  "Like, as if I've been experiencing Florence Nightingale Syndrome?"

31.    Upon hearing his two complaints, defendant Van Beek became notably irritated, impatient and short with plaintiff.  Then, she suddenly moved to the exam room door, opened it, looked back and forth, first, at the open doorway, and then, at plaintiff, suggesting that she wanted plaintiff to leave; then, when plaintiff did not move, she abruptly advised plaintiff that the visit was over, and ordered him to leave. Plaintiff immediately complied with Van Beek's request without saying a word.

32.    Minutes after leaving the office, plaintiff began to regret his compulsive and uncontrollable behavior, and his seemingly accusatory statements.  Therefore, over the next few days, he drafted a letter to defendant Van Beek which he mailed on February 16, 2015.  In his letter, he tried -- in a very respectful and extremely apologetic way – to explain what he was feeling during their last meeting, apologizing for not being able to control his emotions and for the way in which he had acted and spoken to her.  A copy of plaintiff's February 16, 2015 letter is annexed hereto as Exhibit A.

33.    On information and belief, sometime between February 16, 2015, the date on which plaintiff sent the foregoing letter to defendant Van Beek, and February 24, 2015, the date on which plaintiff had a scheduled appointment with defendant Ebright, defendant Van Beek contacted SHIP officials, including defendants William Hines and Joseph Hines, and made a complaint against plaintiff Nastu based upon what she referred to as recent conduct.

34.    In defendant Van Beek's complaint, she accused plaintiff of having engaged in "improper conduct," which had "frightened" her, and which had caused her

10

to be "concerned for her safety and the safety of her colleagues."  More specifically, she reported, inter alia:

(a) that, between December 11, 2014, the date of a scheduled, post-op office visit by plaintiff Nastu, and a date in late December which the doctor could not recall specifically, plaintiff Nastu had brought chocolate candy to her office "on a weekly and sometimes bi-weekly basis;"

(b) that, on the late December date, plaintiff Nastu came to defendant Van Beek's office "unannounced" for an unscheduled office visit;

(c) that, during the late December, unscheduled office visit, plaintiff had reported to her that he "felt very ill" and had "asked for a recommendation for a primary care doctor;" more specifically, "a female doctor who would give him time and understanding as [defendant Van Beek] did, and understood him better;"

(d) that, on January 20, 2015, the plaintiff appeared at defendant Van Beek's office, brought more chocolate candy, and again demanded to see defendant Van Beek "despite the fact that he had no appointment;"

(e) that, after the plaintiff was informed by the doctor's staff that he would have to schedule an appointment for another day, plaintiff initially left, but then returned about an hour later and again demanded to see the doctor;

(f) that, eventually, defendant Van Beek "reluctantly" elected to see plaintiff in order to decide "if he had a medical complaint or if this was more improper conduct."

(g) that, during this "unscheduled" visit on January 20, 2015, the plaintiff "repeated questions which defendant Van Beek had previously answered during plaintiff's prior medical treatment."  Plaintiff "then stated he had pain in his left

11

shoulder." Defendant Van Beek then "reviewed his previous left shoulder MRI results and treatment options with plaintiff, answered all plaintiff's questions, treated him with a cortisone injection, and told him to return for re-evaluation in six to eight weeks;"

(h) that plaintiff Nastu returned to the defendant's office on February 4, 2015 "and again asked questions he had asked previously about his medical treatment." At that time, "he was emotional" and told defendant Van Beek he was both "depressed and anxious." Plaintiff also told defendant Van Beek that he was "experiencing Florence Nightingale Syndrome" with the defendant. By "Florence Nightingale Syndrome," defendant Van Beek understood plaintiff to mean that "he had amorous feelings" for her and "an obsession" with her;

(i) that, during the February 4, 2015 office visit, after plaintiff's statement that he was "experiencing Florence Nightingale syndrome," defendant Van Beek (i) "told him that he needed to respect the physician/patient relationship" and she "recommended that plaintiff see Katherine Takaysu, M.D., a SHIP physician who specializes in relaxation techniques and treats patients who suffer from anxiety and depression;"

(j) that, on February 13, 2015, the plaintiff returned to defendant Van Beek's office and "again stated that he had to see defendant Van Beek -- despite the fact that his left shoulder was significantly improved."

(k) that, upon entering the doctor's exam room, plaintiff Nastu "tried to hug" the defendant and he told the defendant "that he was in love" with her. During the visit, the plaintiff lifted his shirt and stated "look how much weight I'm losing." The plaintiff having somehow become aware that it was the defendant's birthday then

12

proceeded to ask the defendant "inappropriate personal questions" which defendant "declined to answer;"

(l) that, during the visit, defendant Van Beek "became more concerned, even frightened," and "realized plaintiff's conduct was spiraling out of control." Therefore, she "opened the exam room door, ended the appointment, and documented in his medical record that she had "advised him of the importance of maintaining physician/patient boundaries, and that he need not return so frequently for visits;"

(m) that, approximately one week later, defendant Van Beek "received a letter" from the plaintiff; and

(n) that, the content of the letter was "highly alarming" to defendant Van Beek in that the letter stated:

(i) that during their last meeting, defendant Van Beek had "opened the exam room door twice to leave (or escape);"

(ii) that plaintiff "wants to come to the office to meet" with defendant Van Beek "when no one is in the office so no one can hear [him] cry;" and

(iii) that plaintiff ended the letter "by inviting [Van Beek] to play golf with him at Sterling Farms in Stamford."

35.     Defendant Ebright was a SHIP physician whom plaintiff had begun to see, at defendant Van Beek's recommendation, as his primary care physician. Plaintiff first saw defendant Ebright on January 5, 2015, for dizziness and light-headedness, and he had another appointment scheduled with defendant Ebright for February 25, 2015.  On the afternoon of February 24, 2015, eight days after he had mailed his February 16 letter of apology to defendant Van Beek, he was suddenly

13

informed by defendant Ebright's office that the appointment he had scheduled with defendant Ebright for the next day, February 25, was being cancelled, and that a new appointment would not be scheduled.  No explanation for the cancellation or refusal to re-schedule was provided.

36.     Shortly thereafter, plaintiff was contacted by SHIP's Security Director, Dr. Joseph Hines, and told that plaintiff's treatment arrangement with SHIP was presently "under review" and that, pending a final determination on whether SHIP was willing to continue its arrangement with plaintiff, plaintiff was prohibited from entering any premises of any SHIP healthcare provider, even Stamford Hospital.

37.     On March 3, 2015, because of ongoing anxiety and emotional problems, plaintiff went for his scheduled appointment with defendant Takayasu, who is also a SHIP physician.  However, as he sat in the waiting area of defendant Takayasu's office, looking forward to his long-awaited visit, two Stamford policemen arrived at the office, approached him, and informed him that he had to leave.  Thereupon, escorted by police, plaintiff quietly and voluntarily left the doctor's office.

38.     On or about March 6, 2015, plaintiff received a letter from SHIP, a copy of which is attached hereto as Exhibit B.  In the letter, SHIP accused plaintiff of having "exhibited" certain "behavior...towards Dr. Corinne Van Beek on February 13, 2015," and having also written a "subsequent letter to her," which SHIP characterized as "inappropriate."  The letter also informed plaintiff that his treatment arrangement with SHIP, i.e., all healthcare providers who were part of the SHIP physicians' network, including Stamford Hospital, the only hospital located in the town where plaintiff lived, was terminated, effective immediately, and that plaintiff was permanently barred, now

14

and in the future, from entering the premises of all SHIP healthcare providers, including Stamford Hospital.

## COUNT ONE

### (Violation of ADA)

### (As against all defendants, jointly and severally)

39.    Paragraphs 1 through 38 above are repeated and realleged as if fully set forth herein.

40.    All of the conduct attributed to the plaintiff by the defendants, and articulated with specificity in paragraphs 34(a) through 34(n) above as purported justification on the defendants' part for having terminated the patient-provider relationship between the plaintiff and the defendants, and for "blacklisting" him from all future access to the entire SHIP physicians network and Stamford Hospital, was conduct on plaintiff's part which had been caused by, and which was, thus, directly attributable to, the plaintiff's disabling psychiatric disorder.

41.    Accordingly, by terminating the doctor/patient relationship between the plaintiff and the defendants, by permanently "blacklisting" the plaintiff from accessing the services of a substantial number of healthcare providers in the Greater Stamford area, including not only Stamford Hospital itself, the only hospital in the town where plaintiff lived, but also all physicians affiliated with Stamford Hospital, regardless of whether those physicians were also members of SHIP, and by permanently barring plaintiff from accessing such services substantially for the reasons outlined in paragraphs 34(a) through 34(n) above, the defendants have unlawfully denied plaintiff access to a public accommodation by reason of his mental disability in violation of 42 U.S.C. §§ 12182(a), (a)(2)(A)(i), (a)(2)(A)(ii) and (a)(2)(A)(iii).

15

42.     As a direct and proximate result of the defendants' unlawful conduct, permanently "blacklisting" plaintiff from accessing a substantial portion of the healthcare provider community in the Greater Stamford area, the plaintiff has suffered and, in the future, will continue to suffer, imminent, ongoing and continuous harm.

**COUNT TWO**

**(Negligent Infliction of Emotional Distress)**

**(As against all defendants, jointly and severally)**

43.     Paragraphs 1 through 41 above are repeated and realleged as if fully set forth herein.

44.     At the time the SHIP defendants reached their decision to terminate the "patient-provider" relationship with the plaintiff, all defendants either knew, or certainly should have known, that the plaintiff was someone who was in the midst of an "emotional crisis," that he was suffering with severe mental and emotional issues that had caused him to become extremely dependent upon defendant Van Beek, that plaintiff's condition called for timely psychiatric attention and intervention, and that, accordingly, there existed a substantial risk that, if the patient-provider relationship was abruptly terminated, it would cause plaintiff's condition to worsen beyond what it already was.

45.     SHIP operates under a written policy which clearly outlines the circumstances under which the "patient/provider relationship" should or should not be terminated.  Said policy reads in relevant part, as follows:

> -The determination of whether to terminate a patient must be made on a case-by-case basis, taking into consideration such factors as:

16

-The patient's physical health and, if applicable, the severity of…the patient's mental and emotional health.  For example, a patient who is in an emotional crisis or severely depressed should generally not be terminated until he or she becomes stable or assurances are obtained that the patient's care is being transferred to another competent provider.

46.    Despite being fully aware of the attendant risks of terminating the patient-provider relationship in this instance, at a time when SHIP's patient was undoubtedly known to be in the midst of an "emotional crisis," and that, therefore, there was a substantial risk that doing so would likely aggravate or worsen the plaintiff's already tenuous psychiatric condition, and despite the existence of the defendants' own policy counseling against termination of the relationship under such circumstances and conditions, the defendants nonetheless terminated the patient-provider relationship with the plaintiff, in violation of SHIP's own policy.

47.    As a direct and proximate result of the defendants' negligence and indifference to the plaintiff's medical condition, which violated a clear professional duty owed to plaintiff embodied in SHIP's own written policy, the defendants negligently caused plaintiff to suffer severe and heightened levels of mental and emotional anxiety and distress, beyond the levels he had already experienced before being permanently excluded and "blacklisted" by the defendants.

## COUNT THREE

### (Breach of Fiduciary Duty)

### (As against all defendants, jointly and severally)

48.    Paragraphs 1 through 46 above are repeated and realleged as if fully set forth herein.

17

49.     SHIP's own written policy expressly created and acknowledged the existence of a clear fiduciary duty on the part of the defendants to ensure that patients who are in need of medical attention and under the care of SHIP providers not be terminated at times, or under circumstances, when to do so might create a substantial risk of enhanced injury or harm beyond what the patient has already suffered.

50.     By terminating the patient-provider relationship with plaintiff and "blacklisting" him permanently from accessing the SHIP physician's network, including Stamford Hospital and all affiliated doctors - even those who were not part of the SHIP network – the defendants, as professional healthcare providers, breached a clear fiduciary duty owed to the plaintiff.

51.     As a direct and proximate result of said breach of duty, the defendants caused plaintiff to suffer heightened levels of mental and emotional distress, beyond what he was experiencing before being blacklisted.

**COUNT FOUR**

**(Defamation of Character)**

**(As against all defendants, jointly and severally)**

52.     Paragraphs 1 through 38 above are repeated and realleged as if fully set forth herein.

53.     At the time the defendants reached their decision to terminate the patient-provider relationship between the plaintiff and the defendants, SHIP maintained a clearly articulated and affirmatively expressed policy which outlined four specific grounds under which termination of the patient-provider relationship must occur:

a. "Patient Non-Compliance," which expressly included "dishonesty" on the part of a patient;

18

b. "Violence and/or threats of violence" on the part of a patient against another patient or a SHIP member;

c. "Alteration of medical records and/or prescriptions" by a patient; and

d. "Nonpayment on account" by a patient.

54.    On or about March 6, 2015, after sending the plaintiff notice that the defendants had permanently terminated their patient-provider relationship with plaintiff, the defendants then caused plaintiff to be immediately and permanently "blacklisted" from the SHIP physicians network by notifying all SHIP healthcare providers within the network, and all of the providers' employees, of the plaintiff's termination, and that he had been forever barred by the defendants from even entering the business premises of any SHIP provider.

55.    The foregoing notice to the various and numerous members of the SHIP physicians network that the defendants had terminated the patient-provider relationship with plaintiff constituted a knowing and intentional, and/or reckless, publication on the defendants' part of false and defamatory information about the plaintiff, in that any provider in the SHIP network who read the defendants' network-wide termination notice would automatically believe, based solely upon the fact of plaintiff's termination, and the content of SHIP's termination policy, that plaintiff had engaged in at least one of the four types of prohibited, scandalous conduct listed in SHIP's policy as grounds for termination and exclusion.

56.    The knowing and intentional, and/or reckless publication of information by the defendants falsely suggesting, directly and/or indirectly, that plaintiff Nastu had engaged in any of the four types of scandalous conduct identified in SHIP's termination policy as grounds for a patient's termination, constituted libel per se inasmuch as the

19

plaintiff had never, at any time as a SHIP patient, engaged in any of the four types of

scandalous misconduct identified in SHIP's policy as reasons for termination of a

patient-provider relationship.

57.    As a direct and proximate result of said defamatory publication, the

plaintiff has sustained damages.

## COUNT FIVE

### (Intentional Infliction of Emotional Distress)

### (As against defendant Van Beek only)

58.    Paragraphs 1 through 38 above are repeated and realleged as if fully set

forth herein.

59.    At the time defendant Van Beek made accusations to SHIP officials that

plaintiff had engaged in certain "improper conduct," which Van Beek claimed had

"frightened" her, and had caused her to be "concerned for her safety, and the safety of

her colleagues," Van Beek's description of the so-called acts of misconduct in which

plaintiff had purportedly engaged, as well as the purported effects that plaintiff's

purported conduct had supposedly had on her, was, in part, totally fabricated, in part,

highly misleading and, in part, grossly exaggerated.

60.    Defendant Van Beek's decision to falsely accuse the plaintiff of

misconduct, to make misleading representations of fact, and to grossly exaggerate the

purported effects plaintiff's alleged behavior had had on her, was motivated by five

equally substantial, and highly improper, factors:

        a. first, she had become annoyed by conduct on plaintiff's part which had

been directly caused by his debilitating anxiety disorder and, therefore, she simply no

longer wanted him as a patient;

20

b. second, she had been offended by plaintiff when he merely questioned her about why she had neglected to tell him about his left shoulder injury when she had been aware of its existence since as far back as August of 2014; therefore, she no longer wanted plaintiff as a patient;

c. third, she had been thoroughly embarrassed when plaintiff questioned why she had told him not to "fall in love with Dr. Takayasu" and, therefore, did not want to see plaintiff again;

d. fourth, because of plaintiff's extended complaints of pain caused by the cortisone shot, it had occurred to her that the cortisone shot she had administered to plaintiff on January 20, 2015 might very well have been improperly/negligently administered and, could have caused other complications; therefore, she no longer wanted plaintiff as a patient; and

e. when Van Beek read, in the plaintiff's February 16, 2015 letter, that plaintiff viewed her as someone who had "taken on a tremendous burden of being [his] surgeon, [his] M.D. and [his] psychologist," and to whom he had "grown very attached…emotionally," Van Beek was embarrassed and concerned over what she read because she realized that, in the months leading up to this letter, she herself had exhibited certain conduct toward plaintiff, and had had certain conversations with him, that were clearly not part of the doctor-patient relationship and which, therefore, could easily lead reasonable people to believe that she herself had been guilty of "not maintaining physician/patient boundaries." She also realized that certain past conduct which she had exhibited toward plaintiff could very well have caused the "emotional attachment" described in plaintiff's letter.  Because she was concerned and

21

embarrassed about her own past conduct, and the effects it may very well have had on plaintiff, she did not want to see the plaintiff again.

61.    By fabricating, misleading and exaggerating claims of misconduct against the plaintiff for the improper reasons described above; claims so serious that defendant knew or, as a healthcare professional, should have known, full well, that, once made against plaintiff, could very well result in his being permanently terminated and "blacklisted" as a SHIP patient, and could cause his stress and anxiety levels to increase beyond where they already were, defendant Van Beek engaged in extreme and outrageous conduct and caused plaintiff to suffer severe and extreme mental and emotional distress.

62.    As a direct and proximate result of defendant Van Beek's extreme and outrageous conduct, plaintiff has suffered damages.

## COUNT SIX

### (Breach of Fiduciary Duty)

### (As against defendant Van Beek only)

63.    Paragraphs 1 through 38 above are repeated and realleged as if fully set forth herein.

64.    Paragraphs 59 through 61 are repeated and realleged as if fully set forth herein.

65.    As plaintiff's doctor, defendant Van Beek owed plaintiff a fiduciary duty not to engage in any conduct which defendant Van Beek knew, or should have known would be detrimental to plaintiff's health and well being.

66.    By engaging in wrongful and deceitful conduct for the five improper reasons outlined in paragraph 65 above; conduct clearly calculated and intended to

bring about the termination of the patient-provider relationship between plaintiff and the SHIP physicians network at a time when defendant Van Beek knew or should have known that plaintiff was in an emotional crisis, and needed medical advice and assistance, not to be blacklisted, defendant Van Beek breached a fiduciary responsibility to plaintiff.

67.     As a direct and proximate result of defendant Van Beek's breach of a fiduciary duty to the plaintiff, plaintiff has sustained damages.

WHEREFORE, plaintiff claims judgment against the defendants as follows:

As to Count One:

As to all defendants, jointly and severally:

1.      A declaratory judgment in accordance with 28 U.S.C. §§ 2201 and 2202, determining that the defendants have violated the "public accommodations" provisions of the Americans with Disabilities Act, 42 U.S.C. §§ 12182(a), 12182(a)(2)(A)(i), 12182(a)(2)(A)(ii), and 12182(a)(2)(A)(iii);.

2.      A preliminary and permanent injunction pursuant to 42 U.S.C. § 2000a-3(a), enjoining the defendants, and all persons or entities acting on their behalf, or under their management supervision or control, from engaging in any act or acts which constitute, directly or indirectly, the ongoing and continuous "blacklisting" of the plaintiff from access to (a) Stamford Hospital, (b) all healthcare providers in the SHIP physicians network, and (c) all non-SHIP healthcare providers who are affiliated with, and/or who practice medicine at, Stamford Hospital;

3.      An award of costs and reasonable attorneys' fees in accordance with 42 U.S.C. § 2000a-3(b); and

4.      Such other relief as the Court may deem appropriate.

As to each of Counts Two, Three and Four:

As to all defendants, jointly and severally:

1.      Compensatory damages in an amount not yet ascertained, but not less than $1,000,000.00; and

2.      Such other relief as the Court may deem appropriate.

As to each of Counts Five and Six:

As to defendant Van Beek only:

24

1.      Compensatory damages in amount not yet ascertained but not less than $1,000,000.00.

2.      Punitive damages; and

3.      Such other relief as the Court may deem appropriate.

Dated:  February 23, 2016
        Bridgeport, Connecticut

                                        THE PLAINTIFF,
                                        GREGORY NASTU


                            BY:    _____/s/_____
                                   Gary A. Mastronardi
                                   211 State Street
                                   Bridgeport, Connecticut 06604
                                   Tel: (203) 368-0411
                                   Fax: (203) 368-6875
                                   gamlaw@snet.net
                                   ct06312

                                   His Attorney

# Exhibit A

# Gregory Nastu

151 Waterbury Ave,   Stamford, CT 06902   Cell:  203-260-0964     gregory0126@yahoo.com

Corrine Van Beek, M.D.
Premier Medical Group
One Blachley Road
Building 2, 2nd Floor
Stamford, CT 06902

February 16, 2015

Dear Dr. Van Beek:

I am sorry for my comment after my visit on Friday.  I know you didn't mean it (or know it), but you hurt me really bad.  I was trying to tell you something that was very emotional and painful.  Every time I tried to tell you, I felt you were trying to change the topic so you did not have to hear it.  I felt you were rushing my office visit.  You opened the exam room door twice to leave (or escape), when I was still talking.

 After my shoulder surgery I had a lot of feelings coming out, and when you told me my left shoulder had a ¾ thickest tear, well I just lost it. (Pandora's Box was opened).   I have been crying every day for a month (I'm crying as I write this letter).  I want to tell how my shoulder surgery was linked to my car accident when I fractured my neck at C-5.

Before I see Dr. Takayasu, I want to tell you in person.  I want you to hear it from my heart, instead of reading it in a medical report.  Please let me tell you the story.  It will only take 15 minutes.  I can come to your office during a lunch hour when no one is in the office so no one can hear me cry.  I don't want to make a scene at your office.

You have been my doctor for over a year.  I want you to know, you need to know, how your surgery affected me.  I respect your decision and will listen to your advice.  If you think I should tell Dr. Takayasu before I tell you I will accept your decision.  I know you always have my best interest at heart.

 I am going to let Dr. Ebright and you see my files from Dr Takayasu.  Dr. Ebright is my M.D. and I will be seeing her 3-6 times a year. I have a physical examination with her on February 25th.   I see Dr. Takayasu on Tuesday, March 3rd, at her Chelsea Pier office.  I am going to call her office again to see if there was a cancelation.   I want to see her as soon as I can.  I don't think I can wait until March 3rd.  It seems so far away.

So if you want to talk to me, please have your office call me and I will make an appointment.  If not, I will accept your decision.  You have taken on a tremendous burden by being my surgeon, my M.D. and my psychologist.  It is now time for me to let you go.  It is going to be very hard and very painful for me because I have grown very attached to you emotionally.  I think I should stay away from you for awhile so I can work things out with my emotions.

As long as my left shoulder heals in 30-days from the injection, I see no reason for me to see you.  My right shoulder is post surgery 1-year.  My elbow is 6-months post surgery.  Unless you feel I need to see you medically, I will try to stay away.  I am going to continue with my therapy exercise and work out slowly.  I don't want tear my left rotator cuff.  I don't have time for surgery until I graduate from college in December 2015 with an Associate's Degree, Medical Assistant (Clinical).

My job at Godiva is ending soon.  Next week I am only working 12 hours.  I will try to get another job that is less physical so my body can heal more. If not, I hope my shoulder and elbow are strong enough for me to be a waiter if I have to be one.

Thank you for referring me to Dr. Ebright, I am looking forward to being her patient.  Also, thank you referring me to Dr. Takayasu.  I hope she can help me with meditation, my sleep disorder, and helping me with my emotional needs.

Of course, thank you for being a great surgeon and helping me.  I will send you a copy of my college transcripts after finals in May.  I have a summer course from late May until June 25th.  I have to take General Psychiatry (kind of ironic). That's when my summer will start. Who knows, if you get out of work early one afternoon, maybe we could play 9-holes of golf together at Sterling Farms in Stamford (it's my treat).


Yours truly,



Gregory Nastu

# Exhibit B

# STAMFORD HEALTH INTEGRATED PRACTICES
### AN AFFILIATE OF STAMFORD HOSPITAL

SENT CERTIFIED MAIL, RETURN RECEIPT REQUESTED

March 2, 2015

Gregory L. Nastu
151 Waterbury Avenue
Stamford CT 06902

Dear Mr. Nastu:

This letter is to inform you that the physicians at Stamford Health Integrated
(SHIP) are terminating their professional relationship with you effective toda
be able to provide medical care for you. The behavior you have most recentl
Dr. Corinne VanBeek on February 13, 2015 and your subsequent letter to he
and have compromised the physician/patient relationship.   We are requesti
contacting Dr. VanBeek directly.  We are also prohibiting you from seeking c
SHIP practice locations.  We have included a list of our practice locations for

Our practice will provide emergency medical coverage for you for the next 3
to find a new non SHIP healthcare provider during that time. The physician
health insurance plan may be able to help you. If, after 30 days, you have nc
physician, I suggest that you go to a nearby hospital emergency room for an
needs.

Enclosed with this letter is a medical record release form that you should c
to our office so that we will be able to forward a copy of your med
practitioner of your choice.

We are sorry that we have had to make this decision, but believe it is the on
at this time.  We strongly encourage you to find a new healthcare provider a:
you have any questions regarding this please contact Joseph Hines, Director
276-6198.


Sincerely,

Stamford Health Integrated Practices, Inc.

Cc:  Corinne VanBeek, MD
     Deana Ebright, MD

1111 Summer Street  Stamford, CT 06905

# STAMFORD HEALTH INTEGRATED PRACTICES
## AN AFFILIATE OF STAMFORD HOSPITAL

I understand that my treatment or continued treatment by Stamford Health Integrated Practices, Inc.is in no way conditioned on whether or not I sign this authorization and that I may refuse to sign it.

I understand that under applicable law the information disclosed under this authorization may be subject to further disclosure by the recipient and thus, may no longer be protected by federal privacy regulations.

I understand that I may inspect or copy the information to be used or disclosed.

The patient's parent or legal guardian must sign this authorization if the patient is a minor (under age 18) or has a legal guardian.  Minors may sign their own authorizations for records relating to drug/alcohol abuse treatment, sexually transmitted diseases or HIV/AIDS related diagnoses, and in certain circumstances, Mental Health treatment records.

I understand that Stamford Health Integrated Practices Inc. may receive compensation for copying and processing fees related to the use/disclosure of my health information under this authorization.

## PROHIBITIONS ON REDISCLOSURE NOTICE

### Psychiatric Records and Communications

In the event that the information released constitutes privileged psychiatrist-patient communications:

The confidentiality of this record is required under Chapter 899 of the Connecticut General Statutes.  This material shall not be transmitted to anyone without written authorization as provided in the aforementioned statues.

### Drug and Alcohol

In the event that the information released is protected by the HHS Confidentiality of Alcohol and Drug Abuse Patient Records Regulations:

This information has been disclosed to you from records protected by Federal confidentiality rules (42 CFR Part 2).  The federal rules prohibit you from making any further disclosure of this information unless further disclosure is expressly permitted by the written consent of the person to whom it pertains or as otherwise permitted by 42 CFR Part 2.  A general authorization for the release of medical or other information is NOT sufficient for this purpose.  The federal rules restrict any use of the information to criminally investigate or prosecute any alcohol or drug abuse patient.

### HIV Related Information

In the event that information released constitutes confidential HIV related information under Connecticut Law:

This Information has been disclosed to you from records whose confidentiality is protected by state law.  State law prohibits you from making any further disclosure of it without the specific written consent of the person to whom it pertains, or as otherwise permitted by said law.  A general authorization for the release of medical or other information is NOT sufficient for this purpose.

_____          _____
Signature of Patient                                                    Today's Date

_____          _____
Signature of Authorized Representative                        Witness

**If signed by the Authorized Representative, indicate your relationship to the patient below and provide a copy of the supporting documentation:**

☐Parent      ☐Guardian      ☐Conservator   ☐Executor of Estate      ☐Power of Attorney
☐Other (Please Specify)   _____



# AUTHORIZATION FOR RELEASE OF INFORMATION

I, the undersigned patient or legal representative, hereby authorize Stamford Health Integrated Practices, Inc. to use or disclose health information including, if applicable, information relating to the diagnosis or treatment of **mental illness, drug and/or alcohol abuse and confidential HIV/AIDS** related information regarding:

### PLEASE PRINT CLEARLY AND COMPLETE THE FORM ON BOTH SIDES

**Practice Name:** Premier Medical Group
1 Blachley Road, Building 2
Second Floor
Stamford, CT 06902

**Practice Contact: Te**l:  203-276-7409
Fax: 203-276-4134

**Patient Information:**

NAME: _____

AKA / MAIDEN NAME: _____

DATE OF BIRTH: _____ / _____ / _____

ADDRESS: _____

_____

PHONE#: _____

**The information may be disclosed to and used by the following:**

NAME: _____

ADDRESS: _____

_____

PHONE #: _____

FAX #: _____

**The purpose of this disclosure or use is for the following reason:**

☐ Medical   ☐ Legal   ☐ Disability   ☐ Insurance

☐ At the request of the patient or legal representative

**The date(s) of service and the type(s) of information to be used or disclosed is as follows:**

Date(s) of treatment: _____

☐ Entire medical record   ☐ Laboratory reports   ☐ Operative reports   ☐ Billing   ☐ Office / Progress Notes
☐ Radiology reports

☐ Other (please specify) _____

_____

_____

This authorization will be valid for a period of one year from the date below.  I understand that I may cancel this authorization at any time by notifying the Practice in writing, but if I do it will not have any effect on actions that the Practice took before it received the cancellation.



# STAMFORD HEALTH INTEGRATED PRACTICES

AN AFFILIATE OF STAMFORD HOSPITAL

## NEUROLOGY

**FAIRFIELD COUNTY NEUROLOGY**
○ Eric Kung, MD
○ Samit Malhotra, MD
○ Louise D. Resor, MD
○ Evangelos D. Xistris, MD
166 West Broad Street
Suite 203
Stamford, CT 06902
P: 203.276.4464
F: 203.276.4468

**FAIRFIELD COUNTY PEDIATRIC NEUROLOGY**
○ Murray Engel, MD
○ Robert H. Fryer, MD
Tully Health Center
32 Strawberry Hill Court
4th Floor, Suite 7
Stamford, CT 06902
P: 203.276.7159
F: 203.276.2027

**NEW ENGLAND CENTER FOR HEADACHE**
○ Eric Kung, MD
166 West Broad Street
Suite 203
Stamford, CT 06902
P: 203.276.4464
F: 203.276.4468

## OBSTETRICS & GYNECOLOGY

**FAIRFIELD COUNTY OBSTETRICS & GYNECOLOGY**
○ Elisabeth Aronow, MD
1500 Post Road
Darien, CT 06820
P: 203.276.4282
F: 203.276.8585

166 West Broad Street
Suite 403
Stamford, CT 06902
P: 203.276.4282
F: 203.276.8585

○ Sara L. Coca, MD
○ Stephen M. Gallousis, MD
161 Cherry Street
New Canaan, CT 06840
P: 203.276.4282
F: 203.276.4283

## OBSTETRICS & GYNECOLOGY *(continued)*

**FAIRFIELD COUNTY OBSTETRICS & GYNECOLOGY**
○ Carol A. Fucigna, MD
396 Danbury Road
Wilton, CT 06897
P: 203.276.2237
F: 203.276.2639

1500 Post Road
Darien, CT 06820
P: 203.276.4282
F: 203.276.8585

○ Janine M. Popot, MD
1500 Post Road
Darien, CT 06820
P: 203.276.4282
F: 203.276.8585

○ Melindy M. Ciulla, MD
1500 Post Road
Darien, CT 06820
P: 203.276.4282
F: 203.276.8585

**RIVERSIDE OBSTETRICS & GYNECOLOGY**
○ Russell F. Turk, MD
1200 East Putnam Avenue
Riverside, CT 06878
P: 203.637.3337
F: 203.637.3307

## ORTHOPEDICS

**PREMIER MEDICAL GROUP**
One Blachley Road
Stamford, CT 06902
P: 203.276.2277
F: 203.276.2278

**HAND & UPPER EXTREMITY**
○ John D. Dowdle, MD
○ Corrine Van Beek, MD

**PHYSICAL MEDICINE, REHABILITATION AND PAIN MEDICINE**
○ Aris Barbadimos, MD

**SPORTS MEDICINE**
○ Edward Feliciano, MD

## PERSONALIZED HEALTH/ PREVENTATIVE HEALTH

**GREENWICH MEDICAL GROUP**
○ Gail M. Fennell, MD
75 Holly Hill Lane
Greenwich, CT 06830
P: 203.413.1130
F: 203.661.4596

## PULMONARY & SLEEP MEDICINE

**FAIRFIELD COUNTY NEUROLOGY**
○ Samit Malhotra, MD
166 West Broad Street
Suite 203
Stamford, CT 06902
P: 203.276.4464
F: 203.276.4468

**GREENWICH MEDICAL GROUP**
○ Stuart W. McCalley, MD
75 Holly Hill Lane
Greenwich, CT 06830
P: 203.869.6960
F: 203.869.5103

## RADIOLOGY

**BREAST IMAGING**
○ William Caragol, MD
○ Allison Gittens, MD
○ David Gruen, MD
○ Karen Weinshelbaum, MD
Tully Health Center
32 Strawberry Hill Court
2nd floor
Stamford, CT 06902
P: 203.276.5958
F: 203.276.4047

Darien Imaging Center
6 Thorndal Circle
Darien, CT 06820
P: 203.276.6116
F: 203.276.4590

## RHEUMATOLOGY

**PRIME CARE MEDICAL**
○ Tomas J. Vietorisz, MD
80 Mill River Street
Suite 2400
Stamford, CT 06902
P: 203.348.9455
F: 203.348.9183

## SURGERY

**FAIRFIELD COUNTY SURGICAL SPECIALISTS BREAST SURGERY**
○ Jennifer Bishop, MD
○ Zandra Cheng, MD
○ Helen Pass, MD
Tully Health Center
32 Strawberry Hill Court
4th Floor, Suite 8
Stamford, CT 06902
P: 203.276.4255
F: 203.276.4259

**COLON & RECTAL SURGERY**
○ Marilee Freitas, MD
○ Charles E. Littlejohn, MD
70 Mill River Street
Suite LL1
Stamford, CT 06902
P: 203.323.8989
F: 203.975.9904

**FAIRFIELD COUNTY SURGICAL SPECIALISTS GENERAL SURGERY**
○ Xiang Da (Eric) Dong, MD
○ Kevin Miller, MD
○ Joey Papa, MD
○ Michael D. Stone, MD
1351 Washington Boulevard
6th Floor
Stamford, CT 06902
P: 203.276.5959
F: 203.276.5969

1500 Post Road,
2nd Floor
Darien, CT 06820
P: 203.276.8559
F: 203.276.8569

**NEUROSURGERY**
○ Andrea F. Douglas, MD
25 Valley Drive
Greenwich, CT 06831
P: 203.661.3333
F: 203.661.5610

○ C. Cory Rosenstein, MD
70 Mill River Street
Suite LL3
Stamford, CT 06902
P: 203.324.3504
F: 203.969.1392

## SURGERY *(continued)*

**THORACIC SURGERY**
○ Michael I. Ebright, MD
166 West Broad Street
Suite 104
Stamford, CT 06902
P: 203.276.4404
F: 203.276.4405

**TRAUMA**
○ Neeta Chaudhary, MD
○ Marissa DeFreese, MD
○ Kevin Dwyer, MD
1351 Washington Boulevard
6th Floor
Stamford, CT 06902
P: 203.276.5959
F: 203.276.5969

## UROGYNECOLOGY

**UROGYNECOLOGY & PELVIC SURGERY**
○ Brian J. Hines, MD
○ Katherine Sandhu, MD
1351 Washington Boulevard
Suite 201
Stamford, CT 06902
P: 203.391.6620
F: 203.391.6624

276 French Street
Bridgeport, CT 06606
P: 203.572.0030
F: 203.572.0029

SHIP-0714-0025

# STAMFORD HEALTH INTEGRATED PRACTICES

AN AFFILIATE OF STAMFORD HOSPITAL

## CARDIOLOGY

**THE HEART PHYSICIANS**
○ Salvatore Carbonaro, MD
○ Joonun (Chris) Choi, MD
○ Nicola Corvaja, MD
○ Evelyn Cusack, MD
○ Gregory R. D'Onofrio, MD
○ Jeffrey Green, MD
○ Wayne H. Miller, MD
  80 Mill River Street
  Suite 1300
  Stamford, CT 06902
  P: 203.348.7410
  F: 203.961.8488

**STAMFORD HOSPITAL CARDIOLOGY**
  Imaging at Mill River
  80 Mill River Street
  Suite 1400
  Stamford, CT 06902
  P: 203.276.7878
  F: 203.356.4841

○ Edward Schuster, MD
  Tully Health Center
  32 Strawberry Hill Court
  2nd Floor
  Stamford, CT 06902
  P: 203.276.2323
  F: 203.276.2324

**GREENWICH MEDICAL GROUP**
○ Francis J. Neeson, MD
  75 Holly Hill Lane
  Greenwich, CT 06830
  P: 203.869.6960
  F: 203.869.5103

**ELECTROPHYSIOLOGY**
○ Sandhya Dhruvakumar, MD
  Tully Health Center
  32 Strawberry Hill Court
  4th Floor
  Stamford, CT 06902
  P: 203.276.2321
  F: 203.276.2324

## ENDOCRINOLOGY

**FAIRFIELD COUNTY DIABETES & ENDOCRINOLOGY**
○ Maria C. Asnis, MD
○ Melissa Goldstein, MD
○ Bismruta Misra, MD
  1351 Washington Boulevard
  8th Floor
  Stamford, CT 06902
  P: 203.276.7213
  F: 203.276.4938

**MEDICAL ASSOCIATES OF STAMFORD**
○ Leonard Vinnick, MD
  1100 Bedford Street
  Stamford, CT 06905
  P: 203.323.4458
  F: 203.352.4663

## FAMILY MEDICINE

**FAIRFIELD COUNTY PRIMARY CARE**
○ Lawrence D. Leibowitz, MD
  36 Grove Street
  New Canaan, CT 06840
  P: 203 966.6305
  F: 203.966.4618

**STAMFORD FAMILY PRACTICE**
○ Rod Acosta, MD
○ Jennifer Bendl, DO
○ Clarke T. Latimer, MD
○ Angelo Mallozzi, MD
○ Lu Yu, MD
  Tully Health Center
  32 Strawberry Hill Court
  4th Floor, Suite 6
  Stamford, CT 06902
  P: 203.977.2566
  F: 203.977.2568

## GASTROENTEROLOGY

**MEDICAL ASSOCIATES OF STAMFORD**
○ Robert L. Plansky, MD
  1100 Bedford Street
  Stamford, CT 06905
  P: 203.323.4458
  F: 203.352.4663

**FAIRFIELD COUNTY GASTROENTEROLOGY**
○ Robin Forman Rose, DO
○ Richard C. Sheinbaum, MD
  195 Danbury Road
  Wilton, CT 06897
  P: 203.276.8490
  F: 203.276.8491

## GERIATRIC

**GREENWICH MEDICAL GROUP**
○ Allison Ostroff, MD
  75 Holly Hill Lane
  Greenwich, CT 06830
  P: 203.869.6960
  F: 203.869.5103

## INFECTIOUS DISEASE

**STAMFORD INFECTIOUS DISEASES**
○ Michael F. Parry, MD
○ Asha K. Shah, MD
○ Lynda S. Streett, MD
  166 West Broad Street
  Suite 202
  Stamford, CT 06902
  P: 203.353.1427
  F: 203.276.7775

**PRIME CARE MEDICAL**
○ Ralph Cipriani, MD
  51 Schuyler Avenue
  Stamford, CT 06902
  P: 203.327.1187
  F: 203.967.4218

**MEDICAL ASSOCIATES OF STAMFORD**
○ Maher Madhoun, MD
  1100 Bedford Street
  Stamford, CT 06905
  P: 203.323.4458
  F: 203.352.4663

## INTERNAL MEDICINE

**FAIRFIELD COUNTY PERSONAL MEDICINE**
(Concierge Practice)
○ Joshua B. Herbert, MD
○ Craig H. Olin, MD
○ Remi M. Rosenberg, MD
  5 High Ridge Park
  Suite 103
  Stamford, CT 06905
  P: 203.276.4644
  F: 203.276.4090

**FAIRFIELD COUNTY PRIMARY CARE**
○ Carolyn Couture, MD
  396 Danbury Road
  Wilton, CT 06897
  P: 203.276.4015
  F: 203.834.2639

○ Deena Ebright, MD
  36 Grove Street
  New Canaan, CT 06840
  P: 203.966.6305
  F: 203.966.4618

## INTERNAL MEDICINE *(continued)*

**GREENWICH MEDICAL GROUP**
○ Anthony A. Alleva, MD
○ Mary M. Kane-Brock, MD
○ Gail M. Fennell, MD
○ Lisa Kurian, MD
○ Stuart W. McCalley, MD
○ Marcelyn Molloy, MD
○ Francis J. Neeson, MD
○ Allison Ostroff, MD
○ Andrew C. Wong, MD
  75 Holly Hill Lane
  Greenwich, CT 06830
  P: 203.869.6960
  F: 203.869.5103

**INTERNAL MEDKINE ASSOCIATES OF DARIEN**
○ Amanda Collins-Baine, MD
○ Susan M. Collins, MD
○ Maria A. DiGiovanni, MD
○ James R. Dorr, MD
○ Charles Miner III, MD
○ Philip E. Negus, MD
  36 Old Kings Highway South
  Suite 200
  Darien, CT 06820
  P: 203.655.8749
  F: 203.656.0701

**MEDICAL ASSOCIATES OF STAMFORD**
○ Maher Madhoun, MD
○ Lynn J. Morris, MD
○ Robert L. Plansky, MD
○ Richard M. Slutsky, MD
○ Inga K. Tuluca, MD
○ Leonard Vinnick, MD
  1100 Bedford Street
  Stamford, CT 06905
  P: 203.323.4458
  F: 203.352.4663

**PRIME CARE MEDICAL**
○ Ralph Cipriani, MD
○ Neil P. Dreyer, MD
○ Laurie A. Gordon, MD
○ Shara P. Israel, MD
○ Cathrine L. Troy, MD
○ Shira Vadel, MD
  51 Schuyler Avenue
  Stamford, CT 06902

  1351 Washington Boulevard
  4th Floor
  Stamford, CT 06902
  (Temporary Address)
  P: 203.327.1187
  F: 203.967.4218

## INTERNAL MEDICINE *(continued)*

**PRIME CARE MEDICAL**
○ Joseph V. Costanzo, MD
○ Celeste S. Cox-Baldwin, MD
○ Debra A. Daunt, MD
○ Tomas J. Vietorisz, MD
  80 Mill River Street
  Suite 2400
  Stamford, CT 06902
  P: 203.348.9455
  F: 203.348.9183

**PRIME CARE MEDICAL**
○ Vernetta D. Gallop, MD
○ Michael D. Zucker, MD
  555 Newfield Avenue
  Stamford, CT 06905
  P: 203.359.4444
  F: 203.323.3303

**ROBERT A. LINDBERG, MD**
○ Robert A. Lindberg, MD
  1500 Boston Post Road
  Darien, CT  06820
  P: 203.656.1012
  F: 203.656.1005

## NEPHROLOGY

**STAMFORD NEPHROLOGY**
○ Eric Y. Brown, MD
○ Brenda S. Chan, MD
○ William H. Hines, MD
  30 Commerce Road
  Stamford, CT 06902
  P: 203.324.7666
  F: 203.323.2541

**VERIFICATION**

STATE OF CONNECTICUT    )
                        :       ss. Bridgeport, February 23, 2016
COUNTY OF FAIRFIELD     )

    GREGORY NASTU, being duly sworn, deposes and says:

    I am the plaintiff in the within action; I have read the foregoing complaint in the within action and know the contents thereof; the facts alleged therein are true to my own personal knowledge.

_____
Gregory Nastu

Sworn to before me this 23rd day of February, 2016.

_____
Gary A. Mastronardi
Commissioner of the Court