UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| GREGORY NASTU, | : | |
|     Plaintiff, | : | CIVIL ACTION NO. |
| | : | 16-CV-292 (JCH) |
| v. | : | |
| | : | |
| STAMFORD HEALTH INTEGRATED | : | |
| PRACTICES, ET AL., | : | MAY 13, 2016 |
|     Defendants. | : | |

**RULING RE:  DEFENDANTS' MOTION TO DISMISS (DOC. NO. 25)**

**I.    INTRODUCTION**

Gregory Nastu ("Nastu") brings this action under Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12182(a) et seq., against Stamford Health Integrated Practices ("SHIP"), and several SHIP employees.  Complaint (Doc. No. 1) ¶¶ 4-11.  His Complaint alleges that SHIP, a professional network of physicians in the greater Stamford area, violated the ADA by "permanently 'blacklisting' [him] from accessing the services of a substantial number of healthcare providers in the Greater Stamford area" on account of a "disabling psychiatric disorder."  Id. ¶¶ 40-41 ("Count One").  On the basis of largely the same facts, he alleges that the defendants negligently and intentionally caused him emotional distress, id. ¶¶ 43-47; 58-62 ("Count Two" and "Count Five," respectively), breached fiduciary duties to him, id. ¶¶ 48-51; 63-67 ("Count Three" and "Count Six," respectively), and defamed him, id. ¶¶ 52-57 ("Count Four"), in violation of Connecticut state common law.

The defendants have moved to dismiss under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).  Defs.' Mot. to Dismiss ("Motion") (Doc. No. 25); see also Defs.' Mem. in Support ("Defendants' Memorandum") (Doc. No. 25-1).  Nastu has opposed the

1

Motion. With regard to the defendants' arguments under Rule 12(b)(1), alleging that Nastu lacks Article III standing, Nastu has indicated that he rests his opposition on his Memorandum in Support of his pending Motion for a Preliminary Injunction. Pl.'s Mem. in Opposition ("Opposition") (Doc. No. 23) at 2 ("Plaintiff hereby incorporates by reference all the points and arguments pertaining to the issue of 'standing' set forth in . . . his Memorandum of Law In Support of Motion for Preliminary Injunction."); see also Pl.'s Mem. in Support of Motion for Preliminary Injunction ("Plaintiff's Memorandum") (Doc. No. 22) at 13-16. With regard to the defendants' arguments under Rule 12(b)(6), alleging that Nastu has failed to state a claim upon which relief may be granted, Nastu relies on his principal opposition papers. Opposition at 2-10.

For the reasons set forth below, the defendants' Motion is **GRANTED**.

## II. BACKGROUND

SHIP is a professional network of physicians of varying specializations that operates in partnership with Stamford Hospital. Complaint ¶ 11; id. Exhibit B at 33. Defendant Dr. Corinne Van Beek ("Van Beek") is a physician affiliated with SHIP. Id. ¶ 6. Nastu came to Van Beek for orthopedic surgery in 2014 to address issues with his right shoulder and his left elbow. Id. ¶ 16. In a post-operative visit in late 2014, Van Beek identified a mass on Nastu's left deltoid and recommended that he seek an opinion from another SHIP surgeon, Dr. Xiang Dong ("Dong"), regarding the best course of treatment. Id. ¶ 17. During a meeting with Dong in December 2014, Dong recommended that Nastu undergo further surgery to address the mass. Id. ¶ 18.

The recommendation for further surgery caused Nastu to descend into an emotional crisis. Id. Nastu made an unscheduled visit to Van Beek's office in

December 2014, after hearing Dong's recommendation, and expressed concerns that he felt "extremely weak, light headed, dizzy, and just generally ill, and that he had also begun to experience elevated levels of stress and anxiety, sleeplessness, an inability to think clearly and feelings of hopelessness." Id. ¶ 19.  Van Beek referred Nastu to defendant Dr. Deana Elbright ("Elbright"), a primary care doctor in the SHIP network to further assess the mass on his deltoid.  Id. ¶ 20.

Shortly after this meeting, Nastu returned to Van Beek for a scheduled appointment concerning new pains in his left shoulder.  Id. ¶ 22.  At this appointment, Van Beek reviewed an x-ray of his left shoulder, concluded he had a three-quarter thickness tear in his left rotator cuff, and advised that he would eventually have to undergo further surgery on his left shoulder.  Id. ¶¶ 23-24.  At this point, Nastu "began to weep loudly and uncontrollably" and, after leaving her office, he suffered from "an elevated state of depression and anxiety."  Id. ¶ 25.

On February 4, 2015, Nastu made an unscheduled visit to Van Beek's office.  Id. ¶ 26.  He again wept uncontrollably and complained of pain and high levels of stress, anxiety, fear, depression, and hopelessness.  Id.  "During this February 4 visit, plaintiff also could not make himself stop talking," id. ¶ 27, and Van Beek concluded that Nastu needed to see a physician who could address his emotional issues.  She consequently referred him to defendant Dr. Katherine Takayesu ("Takayesu").  Id. ¶ 28.  Van Beek is alleged to have said "I'm referring you to Dr. Takayasu; try not to fall in love with her."  Id.  Nastu claims that this statement "let him speechless" and that he interpreted it as a suggestion that Van Beek "believed that [Nastu] was acting like he had fallen in love with her."  Id.

3

At his next scheduled appointment, on February 13, 2015, Nastu "walked into the office with tears in his eyes, weeping profusely, and[ ]still obsessed with the fear of future surgery." Id. ¶ 29.  During this meeting, he also demanded to know whether Van Beek thought he was in love with her.  Id. ¶ 30.  Van Beek, in response to Nastu's concededly out of control behavior, "advised [him] that the visit was over," and ordered him to leave.  Id. ¶ 31.

"Minutes after leaving the office, [Nastu] began to regret his compulsive and uncontrollable behavior, and his seemingly accusatory statements."  Id. ¶ 32.  He then sent her a letter on February 16, 2015, in which he wrote, among other things, "So if you want to talk to me, please have your office call me and I will make an appointment.  If not, I will accept your decision. You have taken on a tremendous burden by being my surgeon, my M.D., and my psychologist.  It is now time for me to let you go.  It is going to be very hard and painful for me because I have grown very attached to you emotionally.  I think I should stay away from you for awhile so I can work things out with my emotions. . . . Unless you feel I need to see you medically, I will try to stay away." Complaint, Exhibit A (Doc. No. 1) at 27-28.

Between the date Nastu sent the letter and his next appointment with a SHIP physician (February 16, 2015), Van Beek contacted SHIP personnel to complain of Nastu's conduct.  Complaint ¶ 33.  In the complaint, Van Beek accused Nastu of, among other things, "improper conduct" that had "frightened her" and that had caused her to be "concerned for her safety and the safety of her colleagues."  Id. ¶ 34.  She claimed that Nastu had demanded to see her without an appointment while bringing her chocolates, that he had "tried to hug" her and told her "that he was in love" with her.  Id.

4

She further stated that the letter Nastu sent was "highly alarming" for a number of reasons, including that it had stated that Nastu wanted to meet with her "when no one is in the office so no one can hear [him] cry." Id.

On February 24, 2015, Nastu was informed that his appointment with Elbright had been cancelled. Id. ¶ 35. Shortly thereafter, SHIP's security director advised him that his treatment arrangement with SHIP was under review and that he was, according to Nastu, "prohibited from entering any premises of any SHIP healthcare provider, even Stamford Hospital." Id. ¶ 36. On March 3, 2015, he went to Takayasu's office for a scheduled appointment but was escorted away by two Stamford police officers from the waiting room. Id. ¶ 37.

On March 6, 2015, Nastu received a letter from SHIP informing him that it was "prohibiting [him] from seeking care at SHIP practice locations," and that it would only provide emergency medical care for 30 days. Id. ¶ 38; Complaint Exhibit B. Though the Complaint alleges that, by this letter from SHIP, Nastu is barred from Stamford Hospital, "the only hospital located in the town where plaintiff lived," the letter does not state this; the list of providers to which he is barred, which was annexed to SHIP's letter does not include Stamford Hospital and the letter encourages Nastu "to go to a nearby hospital emergency room" should he not have a new physician after 30 days. Id.

On February 23, 2016, Nastu filed the instant lawsuit, and made a Motion for a Preliminary Injunction. See Complaint and Motion for Preliminary Injunction (Doc. No. 2). At a conference concerning the Motion, counsel for Nastu conceded that Nastu is currently seeing new physicians. On March 31, 2016, the defendants moved to dismiss on the basis, inter alia, that Nastu lacks standing to sue. See Defendants' Motion.

5

### III.     STANDARD OF REVIEW

"In resolving a motion to dismiss under Rule 12(b)(1), the district court must take all uncontroverted facts in the complaint . . . as true, and draw all reasonable inferences in favor of the party asserting jurisdiction." Tandon v. Captain's Cove Marina of Bridgeport, Inc., 752 F.3d 239, 243 (2d Cir. 2014).  Where jurisdictional facts are in dispute, the court has the power to decide issues of fact by reference to evidence outside the pleadings, such as affidavits. Id.  The burden is on the plaintiffs to establish jurisdiction.  Renne v. Geary, 501 U.S. 312, 316 (1991); see also Tandon, 752 F.3d at 243.

### IV.     DISCUSSION

The United States Constitution provides, inter alia, that the "judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority."  U.S. Const. art. III, § 2.  For a litigation to constitute a "Case" within the meaning of Article III, and consequently for subject matter jurisdiction to exist, the plaintiff must have standing to sue.  See, e.g., Kreisler v. Second Ave. Diner Corp., 731 F.3d 184, 187 (2d Cir. 2013) (per curiam).  To establish such standing, the plaintiff has the burden to prove: "(1) injury in fact, which must be (a) concrete and particularized, and (b) actual or imminent; (2) a causal connection between the injury and the defendant's conduct; and (3) that the injury is likely to be redressed by a favorable decision." Id.  Plaintiffs seeking injunctive relief must also show that "the identified injury in fact presents a real and immediate threat of repeated injury." Id. (internal quotation marks and citation omitted).

Title III of the ADA provides that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation." 42 U.S.C. § 12182(a).  In a series of cases beginning with Camarillo v. Carrols Corp., 518 F.3d 153, 158 (2d Cir. 2008) (per curiam), the Second Circuit has instructed that, to establish "injury in fact" for purposes of Article III standing in a lawsuit arising under the ADA, a plaintiff must show that "(1) she has alleged past injury under the ADA . . . (2) it is reasonable to infer from her complaint that this discriminatory treatment will continue; and (3) it is also reasonable to infer . . . that [the plaintiff] intends to return [to the defendant accommodation] in the future."  Id. (emphasis added) (citing Pickern v. Holiday Quality Foods, Inc., 293 F.3d 1133, 1137-38 (9th Cir. 2001)); see also, e.g., Kreisler, 731 F.3d at 187-88 (same); Harty v. Greenwich Hosp. Grp., LLC, 536 Fed. App'x 154, 154-55 (2d Cir. 2013) (summary order) (same); Pincus v. Nat'l R.R. Passenger Corp., 581 F. App'x 88, 89 (2d Cir. 2014) (summary order) (same).

After review of the parties' legal argument and the record before the court, the court concludes that Nastu has not carried his burden of establishing that it is reasonable to infer that he will return to physicians in the SHIP network.  Consequently, he lacks Article III standing.

As an initial matter, the court observes that, according to his own counsel, Nastu is currently being treated by other physicians, a fact that cuts against any claim that he "intends to return" to physicians in the SHIP network.  Camarillo, 518 F.3d at 150.  Of greater concern to the court, however, is the fact that his Complaint is devoid of any

7

assertion that he even desires to utilize to SHIP physicians, let alone an intent to seek their services.

Nastu claims that it is "certainly 'reasonable to infer' . . . that plaintiff genuinely desires and intends to return to the SHIP network once an injunction issues and the 'blacklisting' is terminated," based upon "(1) the frequency of plaintiff's past access to SHIP's services, (2) the strong public demand for the services of SHIP's highly reputable doctors provide, and (3) the proximity of SHIP's doctors to plaintiff's residence." Plaintiff's Memorandum at 15.

First, Nastu's Complaint does not allege an intent to return to SHIP physicians, and "does not evidence any concrete plan" or need to employ SHIP physicians "in the future." Harty, 536 F. App'x at 155. Whatever the many specialist physicians in the SHIP network may have done to create a "strong public demand," Plaintiff's Memorandum at 15, and however geographically close some SHIP physicians may be to Nastu's residence, Plaintiff's Memorandum at 15, Nastu simply has not explained why he would need or want to engage with SHIP physicians going forward, when many other physicians in greater Stamford are available to meet his needs. See Decl. of Simon Allentuch & Exhibits 1 & 2 (Doc. No. 25-2).

Nor is there any evidence before the court making it plausible to infer an intent to return to SHIP physicians. The physicians in the SHIP network to whom Nastu had "frequen[t] . . . past access" are the very same from whom he is now seeking at least $1,000,000 in compensatory damages for, inter alia, intentional and negligent infliction of emotional distress. It is implausible that Nastu would seek—and if he did so seek, that he could reasonably be expected to obtain—medical treatment from those

8

physicians again.  See Richter v. Conn. Judicial Branch, No. 3:12cv1638 (JBA), 2014 WL 1281444, at *11 (D. Conn. Mar. 27, 2014) ("Given that [defendant law firm] sued Richter for unpaid fees and that Richter asserts that the firm provided 'inadequate representation,' it is not plausible that Richter would again seek [defendant law firm]'s legal representation.  Accordingly, Richter claims [under the ADA] must be dismissed on th[e] basis [of lack of constitutional standing].").

Finally, though Nastu claims that the Stamford Hospital is now off-limits to him due to his SHIP "blacklisting," Complaint ¶ 38, the documents appended to his Complaint suggest otherwise.  In the letter that SHIP sent to Nastu informing him of his having been blacklisted from SHIP, SHIP wrote that Nastu was barred from seeking care at SHIP practice locations and provided a list of those locations.  Though SHIP is designated as "an affiliate of Stamford Hospital," nowhere on that list of practices to which Nastu is barred from seeking care does it indicate that Stamford Hospital is such a location.  See Complaint Exhibit B (Doc. No. 1) at 33-34.  Further, SHIP's letter encourages Nastu to seek emergency room care at "a nearby hospital" should he not obtain a new physician after 30 days (during which time he could seek emergency care from SHIP practitioners).  Id. at 30.  As Nastu has asserted, the only "nearby hospital" is Stamford Hospital.  Complaint ¶ 38.  In light of these documents, the court is not persuaded that Nastu would be barred from seeking care at Stamford Hospital.  Even if Nastu could not seek care at Stamford Hospital, Nastu has not alleged sufficient facts to make it "reasonable to infer" that he imminently desires or needs to seek such care. Harty, 536 F. App'x at 155.

For these reasons, Nastu has not shown it is "reasonable to infer . . . that [he] intends to return to [SHIP physicians] in the future." Camarillo, 518 F.3d at 158. Consequently, Nastu does not have standing to sue, and his Complaint does not present a "case or controversy." The case is dismissed for lack of jurisdiction.

## IV.  CONCLUSION

For the reasons set forth above, the defendants' Motion to Dismiss (Doc. No. 25) is **GRANTED** as to Count One of the Complaint (Doc. No. 1). Given the outcome of this Ruling, it is unnecessary to address the remainder of the defendants' Motion. The remaining state law Counts arise under this court's supplemental jurisdiction granted in section 1367 of title 28 of the United States Code, and the court declines to exercise jurisdiction over them. The Clerk is directed to close the case.

**SO ORDERED**.

Dated at New Haven, Connecticut, this 13th day of May, 2016.

/s/ Janet C. Hall
Janet C. Hall
United States District Judge